THOMPSON et al. v. STATE.

(Division B. Oct. 6, 1930.)

[130 So. 112. No. 28602.]

122

J. P. and **A. K. Edwards** and **Hilton & Hilton**, all of Mendenhall, for appellants.

**W. A. Shipman,** Assistant Attorney-General, for the state.

Argued orally by **R. T. Hilton,** for appellant, and by **W. A. Shipman,** Assistant Attorney-General, for the state.

**Anderson, J.,** delivered the opinion of the court.

Appellants were indicted and convicted in the circuit court of Copiah county of the crime of assault and battery, with intent to kill and murder one Vardaman Greer,

for which they were sentenced to the penitentiary for a term of ten years. From that judgment they prosecute this appeal.

The principal evidence for the state was that of the injured man, Vardaman Greer. Appellants, as witnesses in their own behalf, denied guilt, and introduced kinspeople and others to establish an alibi. The evidence was sufficient to sustain the conviction.

Appellants assign, and argue as error, the giving of the following instruction for the state:

"The court instructs the jury for the state that if you believe from the evidence beyond all reasonable doubt that the defendants wilfully, unlawfully, feloniously, and of their malice aforethought, assaulted and beat Vardaman Greer as charged in the indictment, then it is the sworn duty of the jury to promptly return the following verdict: We, the jury, find the defendant guilty as charged in the indictment."

The criticism of the instruction is that it failed to define properly the offense with which appellants were charged, because there was left out of it the requirement that the evidence show that the assault and battery was committed *with the intent to kill and murder.* It will be noted that the instruction refers the jury to the indictment for the definition of the intent. Appellants contend that this cannot properly be done. No other instruction given on either side cured this error, if error it was. To sustain thier position, appellants cite Southern R. Co. v. Ganong, 99 Miss. 540, 55 So. 355; Y. & M. V. R. Co. v. Cornelius, 131 Miss. 37, 95 So. 90; Upton v. State, 143 Miss. 1, 108 So. 287; Cummins v. State, 144 Miss. 634, 110 So. 206.

In the Ganong case the jury were instructed to return a verdict in favor of the plaintiff if the evidence showed he was injured "in the manner set out in the declaration." The court said this was error; that the jury were entitled to have the law of the case, as given by the court,

written out in full in the instructions; that to require the jury to resort to the pleadings in the case to piece out the instructions was calculated to confuse and mislead them; that in many cases the pleadings set out the cause of action, and the defense thereto, at such length, and sometimes with such prolixity, that it would be exceedingly difficult for the jury to extract therefrom the allegations of the pleadings sought to be incorporated in the instructions. But the court held that the error was harmless for two reasons, one of which was that the facts in that case, on which the cause of action was grounded, were so clearly set out in the declaration that the jury could readily refer to it, and ascertain what the court meant by the instruction.

In the Cornelius case the court charged the jury, in five instructions, that if the evidence showed that plaintiff was injured in the manner charged in the declaration, they should return a verdict in his favor. The court held these instructions to be erroneous, and also two other instructions given for the plaintiff. A reading of the opinion in that case will demonstrate that the judgment would have been reversed on account of the giving of the other two instructions alone. There is nothing in the opinion in that case that justifies the conclusion that the court would have reversed the judgment upon the ground of the giving of the five instructions alone, directing the jury to go to the declaration in order to determine whether the plaintiff was injured in the manner therein charged.

In the Upton case the court charged the jury that if they believed from the evidence, beyond a reasonable doubt, that the defendant deliberately murdered the deceased "as charged in the indictment herein," then the jury should return one of three verdicts. The court held that the instruction was erroneous, but that the error

was cured by instructions for the defendant, in which the elements of murder were properly defined.

The Cummins case was to the same effect as the Upton case; the error was cured by the other instructions.

In the case under consideration the indictment so clearly and briefly describes the intent which the law required should be present with the assault and battery, that we cannot say with any degree of confidence that the instruction in question was misleading to the jury. This is not a case where the pleading referred to in the instruction is lengthy and complicated.

The court gave the following instruction for the state:

"The court instructs the jury for the state, that you are the sole judges of the credibility of the witnesses who testified in this case, and in determining what weight you should give the testimony of any witness, you have the right to consider their demeanor upon the witness stand; what interest, if any, they have in the results of this trial, if it has been shown by the evidence they had any, and all other facts and circumstances in the evidence in this case."

Appellant's objection to this instruction is that it was on the weight of the evidence; that it singled out the testimony of the appellants as witnesses in their own behalf and was calculated to discredit them as such witnesses. The principle contended for by appellants has no application in this case because, besides appellants themselves, several other material witnesses testified in their behalf. The jury, therefore, could not have construed the instruction as having been directed solely at the testimony of appellants as witnesses in their own behalf. Vails v. State, 94 Miss. 365, 48 So. 725; Poole v. State, 100 Miss. 158, 56 So. 184; Hughey v. State (Miss.), 106 So. 361; Jones v. State, 130 Miss. 703, 94 So. 851; Jones v. State, 154 Miss. 640, 122 So. 760.

Appellants requested an instruction in this language:

"The court instructs the jury for the defendants, that the defendants are competent witnesses in their own behalf and that you have no right to discard their testimony, not either of them, or to look upon their testimony with suspicion merely because they are the defendants in this cause, and that if you have no other reason to disbelieve them than the fact that they are the defendants, then you must believe their testimony to be the truth."

The court modified the instruction by striking out the concluding clause, "and thereupon promptly acquit the defendants." So modified, the appellants used the instruction. Appellants assign as error the action of the court in so modifying the instruction. We are of opinion that there is no merit in appellant's position. The instruction, as requested, was clearly on the weight of the evidence, and therefore was properly modified by the court so as to eliminate that feature of it.

Appellants could not have been legally convicted, except for the evidence of the state's witness Vardaman Greer. Appellants moved to exclude his testimony, upon the ground that he was mentally incapable of testifying. The court overruled appellant's motion, and that action of the court is assigned and argued as error. By the assault and battery the skull of the witness Greer was crushed in two places, and his brains were oozing out. For some days after the assault and battery he was unconscious. At the time of the trial he was unable to sit up, and gave his testimony lying down.

In order to properly consider this question, we deem it necessary to set out his testimony in full, and the ruling of the court thereon:

"Direct examination:

"Q. Tell the jury your name? A. Vardaman Greer.

"Q. Vardaman Greer? A. Yes, sir.

"Q. How old are you, Vardaman? A. Twenty-two.

"Q. You say you are twenty-two years of age? A. Yes, sir.

"Q. Are you married? A. Yes, I have been married.

"Q. How long were you married? A. Two years and a half.

"Q. Who did you marry? A. Lillian Thompson.

"Q. Do you know Mr. Jim Thompson? A. Yes, sir.

"Q. What kin is she to Jim Thompson? A. His girl.

"Q. She is his girl? A. Yes, sir.

"Q. What's Mr. Jim Thompson's boy's name, his son? A. Buddie Thompson.

"Q. That's his nickname? A. Yes, sir.

"Q. What was his real name, do you know? A. I don't know what it was, I always called him Buddie.

"Q. That was the name you knew him by? A. Yes, sir.

"Q. Do you recall the time you and your brother went off in search of work? When was that? A. Me and Buddie?

"Q. No, you and your brother? A. Yes, sir.

"Q. Where did you all go? A. Sir?

"Q. Where did you and your brother go to work? A. Me and my brother went over there—I can't think of it.

"Q. What did you go over there to do? A. Me and him went over there and worked about three or four days, I reckon.

"Q. What kind of work did you do? A. That is, I can't think of that stuff, what's the name—I can't think of it.

"Q. Cotton? A. Yes, sir.

"Q. Went over there to pick cotton? A. Yes, sir.

"Q. Now, then, you went off and who came after you? A. Papa and my brother.

"Q. Your father and your brother? A. Yes sir.

"Q. Where did they bring you to? A. They brought me to my house, to papa's house.

"Q. To your father's house? A. They told me to stay there and work there.

"Q. And work there? A. Yes, sir.

"Q. Did you go away from your father's house after that? A. Left and went to—

"Q. (Interrupting) did you leave there twice? A. No, sir, just one time, I left home Thursday morning and to go to Delhi to work and Sunday evening about one o'clock I was coming home and I got to Vicksburg about four o'clock and a little after dark I got back there to Jim Patrick's. Buddie Thompson and Jim Thompson, one of them struck me right here and knocked me down and hit me right there and knocked me down, and killed me, that is the last time—killed me right along there.

"Q. What did they hit you with? A. They hit me with that there—I didn't know what they hit me with.

"Q. What time of night was that? A. Right after dark.

"Q. Right after dark? A. Yes, sir.

"Q. Where were you at the time they hit you? A. Well, sir—

"Q. (Interposing) How far were you from your father's house when they hit you? A. Just about a half a mile.

"Q. Just about a half a mile? A. Yes, sir.

"Q. What county and state was that in? A. Copiah county.

"Q. And the state of what? A. I just can't think to tell you.

"Q. It was Copiah county, do you know what state it was in? A. Yes, sir, I know but I just can't think.

"Q. Was it state Mississippi, State of Mississippi? A. It was Mississippi.

"Q. What place was it you went to before they hit you? A. Delhi.

"Q. What state was that? A. Delhi, Louisiana.

"Q. Where you got hit was what? A. Copiah.

"Q. Copiah county, Mississippi? A. Yes, sir.

"Q. Copiah county, Mississippi? A. Yes, sir.

"Q. How many men were hitting you there? A. Well, it was three and four girls, when I turned to go home I seen them and the girls and the women went back through the yard, around that way back of the house.

"Q. Who was it hit you? A. Jim Thompson and Buddie Thompson and Jim Patrick.

"Q. Jim Thompson and Buddie Thompson and Jim Patrick? A. Yes, sir.

"Q. Did you see what they hit you with? A. No, sir, I didn't see the—what they hit me with.

"Q. Do you know what they had with them after they hit you? A. No, sir, they just killed me right here when they come up they says they kill me.

"Q. Did you have on this same coat? A. Yes, sir.

"Q. This same coat right here? A. Yes, sir.

"Q. Do you know where you were found after you were knocked unconscious? A. No, sir, the last time I remember, I had been there three or four days but I knowed I was alive.

"Q. You didn't remember anything? A. No, sir.

"Q. Take the witness.

"Cross-examination:

"Q. Mr. Greer, you say this happened there at Patrick's house? A. Yes, sir, where Mr. Patrick, Mr. Jim Patrick lives.

"Q. You say you saw some girls in the yard? A. Yes, sir, three or four coming in that way—they went that way and ran around the yard.

"Q. You know who those girls were, Mr. Greer? A. No, sir, I don't know them.

"Q. About how many girls did you see there? A. Well, three or four of them, I reckon.

"Q. Three or four? A. Yes, sir.

"Q. Were they in the yard, Vardaman, or the outside? A. Yes, sir, were in the yard and when they seen me coming around they went out through the back end of the house.

"Q. What time was that? A. Right after dark.

"Q. Right after dark? A. Yes, sir.

"Q. Was the moon shining that night? A. I don't know exactly.

"Q. But you could see the girls? A. Yes, sir, when I turned in towards home the light was showing exactly right towards the house. You see, I had to go by there, I had to come that way and I had to pass that way and hit the road the other side so I could go home.

"Q. Did anything happen in the road? A. Just as I turned around and started that way well, a little piece before they killed me.

"Q. And it happened in the road? A. Yes, sir.

"Q. Were you in your car when you were struck? A. Yes, sir, right there. Buddie Thompson got me right there and knocked me down, you see, and killed me and Jim Patrick knocked me back down and Jim Thompson knocked me that way and you see all three of them killed me.

"Q. Did they ever take you out of your car or not? A. They knocked me out of the Ford, knocked me out, never opened the—

"Q. (Interposing) the door? A. No, sir, they just knocked me out and left it, still in there.

"Q. Did he open the door before they struck you or not? A. No, sir, it was still that a way and he hit me and knocked me over the back and killed me on the ground.

"Q. The names of the men that came to the car and struck you in the car? Where were they? A. Jim Thompson standing on this side, Buddie Thompson on this side and Jim Patrick on the front side coming around this way and Buddie Thompson was on this side when he was killing me and the other two come around this way and knocked me and killed me.

"Q. That's all.

"Redirect examination:

"Q. Did you have any money in your pocket? A. Yes, sir, ninety-two dollars and a half.

"Q. Did you have— A. (Interrupting) I never seen it any more, I had ninety-two dollars and half in my pocket when I was coming home.

"Q. What became of your car? A. I never seen it any more.

"Q. The money and the car both gone? A. Yes, sir, I had ninety-two dollars and a half in the pocket in that roadster, that is the last time I seen it.

"Q. That's all.

"Recross-examination:

"Q. Did you have that money in your pockets when you left Louisiana? A. Yes, sir, and coming home, I was coming home and it was in my pocket ninety-two dollars and a half.

"Q. Do you remember about what time you left Vicksburg? A. About four o'clock.

"Q. Stand aside."

At the conclusion of his testimony appellants made the following motion:

"Now comes the defendants by their attorneys, Edwards and Edwards and Garth and moves the court to exclude all of the testimony offered by the witness and injured party, Vardaman Greer, for the reason that he is not at the present time a normal man; that he was brought into the courtroom on a cot or bed, placed on a table and was exceedingly weak; second, that the said Vardaman Greer now is not in a normal condition but that his mind goes and comes and is rather muddy or cloudy and not mentally able to testify as a witness in this or any other case; third, that the witness, Vardaman Greer, as heretofore stated, was laying at the time he was testifying, was not able or did not set and face the jury but lay flat on his back and that the jury could not observe or notice his countenance to pass upon his testimony as they had a right to do under the law, and that

on account of his mental and physical condition, as heretofore stated, counsel for the defense could not and did not have the opportunity of cross-examining the witness as they could and would have done had the witness Vardaman Greer been physically fit and mentally fit to have undergone a cross-examination.''

In overruling appellant's motion, the court gave its reasons therefor in this language:

''Upon a careful consideration of the motion made above, the court was careful to observe the witness Vardaman Greer because if the court entertained a well-founded doubt as to the mental capacity of the witness to tell or relate in a straight-forward consistent manner the happenings inquired about, he would ex mero motu have had the witness withdrawn. However, after careful observation of this witness, the court was convinced that his was at that time more a case of physical inability, his bodily vigor had been and was impaired to such an extent that he could not move around and use his limbs. Yet the court was convinced that he understood and appreciated the situation. The court was of opinion that his answers were in all respects responsive to the questions asked. His recitation of the events which he undertook to detail to the jury were all consistent and in the opinion of the court so reasonable as to convince the court that he was then in possession of his mental faculties. The court is of opinion that the record of his testimony as taken by the official stenographer will demonstrate that the witness appreciated the situation and fully understood the questions propounded to him and will demonstrate further, that his answers were not characterized by evasion or by misconception but on the contrary, demonstrated a full and conscious appreciation of the things asked. The weight of this testimony is of course for the jury but this court cannot now say that the testimony should not under our law go to the jury to be weighed and considered by them. With reference

to the suggested fact that the defendants were not in a constitutional sense able to cross-examine the witness, the court will observe that while of course the witness was in a reclining position, the jury were permitted and did in fact stand in front of the witness, they saw him and each juror heard the testimony and the court is clearly of opinion that the physical condition of the witness did not keep him from giving testimony to the jury. For these reasons the motion is overruled.''

We are of the opinion that Greer was a competent witness. The court and jury saw him; they observed his manner of testifying and his expression, and were in better position to pass upon his competency as a witness than this court.

We find no merit in the other assignments of error, and do not think they are of sufficient gravity to call for a discussion by the court.

Affirmed.